IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Criminal No.: 2:11-CR-44 |
| ) | |
| RAY ADAMS, ) | |
| ) | |
| Defendant. ) | |

## AMENDED *MASSIAH* MOTION TO EXCLUDE

Comes now Defendant, Ray Adams, by and through undersigned counsel, and respectfully amends his *Massiah* Motion to Exclude (Doc. 152), in order to supplement said Motion with additional information provided to Defendant pursuant to his *Brady* requests, and shows the Court as follows:

## I. FACTS

1.

On January 31, 2013, the Government provided Defendant with two FBI reports regarding FBI special agent interviews with a previously undisclosed witness called S-00053029 in the reports, but identified by the Government as David Watts.

2.

Watts was convicted in Wisconsin on October 18, 1996, on five counts of

1

first degree sexual assault and one count of kidnapping, for which he received a sentence of 180 years. *See* Exhibit A to first *Massiah* Motion (Doc. 152-1).

3.

On **December 5, 2012**, the Hon. Kathlene F. Gosselin, Superior Court of Hall County, Northeastern Judicial Circuit, issued an Order to Transport Out-of-State Inmate, directing the Hall County Sheriff to transport David Watts from Wisconsin to Hall County to appear as a witness in *State v. Stevan R. Senter*, 2008-CR-1799-B on January 9, 2013. *See* Exhibit F, Order filed December 6, 2012.

4.

In a report dated June 24, 2013, FBI SA S. Jason Harris stated that "**[i]n late 2012**, the Atlanta Division **operated a CHS** who reported on conversations that he had in the Hall County Jail with ADAMS." *See* Exhibit G, FBI FD-1057 dated June 24, 2013, Bates range 0002904-0002906, at page 2.

5.

According to the FBI report, Watts was transferred from Wisconsin to the Hall County Jail on January 8, 2013. Jail records show that Watts was put in Defendant Ray Adams' cell on January 9, 2013, at 01:06. *See* Exhibit H, Comprehensive Justice Information System Cellmates Report, at page 3.

6.

According to the report, **sometime between Watts' arrival in Adams' cell on January 9, 2013, at 01:06, and the FBI agents' interview six days later on January 15, 2013**, Watts wrote a letter addressed to retired FBI agent Scott Matthewson and sent to the Northern District of Georgia United States Attorney's Office.[1] In the letter, Watts purported to have information regarding threats to various federal offices and officials by Adams. **The Government still has not provided that letter to Defendant Ray Adams.**

7.

On **January 14, 2013**,[2] Watts sent another letter to the U.S. Attorney's Office for the Northern District of Georgia advising of information regarding the Militia of Georgia, botulism, ricin, and other information. Watts references his first letter to the U.S. Attorney's Office and his request that the first letter be faxed to "Department of Homeland Security special agent Mr. Scott Mathewson, who is in charge of this investigation." *See* Exhibit I, Letter dated January 14, 2013, Bates range SOURCE-RPT-000229 – 232.

---

[1] All of this allegedly occurred in five days.
[2] This is the same date that Watts testified in the hearing on the motion for new trial in *State v. Senter*.

8.

On **January 15, 2013**, one week after Watts' return to Hall County, FBI agents from the Gainesville office came to interview Watts in response to his letter. The agents listed present at that meeting are SA S. Jason Harris, SA Frank Dixon, and SA David Wylie.

9.

At the January 15, 2013, interview, Watts told the FBI agents that Defendant Adams "quickly came to trust and confide in" Watts and made many incriminating statements regarding the charges Adams currently faces in this case.

10.

Watts also reported that he had talked one of their cellmates out of stabbing Adams in his sleep with a homemade knife and prevented attacks on Adams by the cellmate. He also stated he had convinced Adams not to report the attempted attacks.

11.

Watts told Adams he agreed that the jail staff was reading Adams' mail, and Watts agreed to mail a letter for Adams in order for Adams to "avoid detection."

12.

Watts lied and told Adams that the federal government had drug trafficking

charges against him. He also lied and told Adams that he had a female cousin who lived in Decatur, Georgia.

13.

When the FBI agents asked Watts why he reported this information to them, Watts first expressed a concern for public safety, but then said he wanted assistance in a civil case against a law enforcement agency in Wisconsin, as well as a transfer to federal custody for his safety. The agents stated that they would advise the United States Attorney's Office of Watts' desire for federal custody.

14.

On **January 17, 2013**, Watts wrote a letter to SA S. Jason Harris stating Adams had made a written threat against President Obama and written comments about castor beans and ricin. *See* Exhibit J, Letter dated January 17, 2013, Bates range SOURCE-RPT-000233 – 235. **On the same day,** Watts was moved from Adams' cell on January 17, 2013, at 12:28. *See* Exhibit H at 3. However, Watts continued to supply the FBI with information regarding Adams. *See, e.g.,* FBI FD-1023 dated January 21, 2013, Bates range SOURCE-RPT-000257 – 258 (Watts reporting to SA S. Jason Harris regarding Adams); FBI FD-1023 dated August 6, 2013, Bates range SOURCE-RPT-000276 – 278 (Watts meeting with SA David Wylie, SA S. Jason Harris, and SA Roger Charnesky for "trial preparation", at

which time Watts amended some of his previous statements to the FBI) (not attached as exhibits).

15.

On **January 18, 2013**, the FBI requested authorization for Watts to wear a wire to record his conversations with Adams in jail. *See* Exhibit K, Memorandum dated January 18, 2013, Bates range SOURCE-RPT-000248 – 000251. In explaining the necessity of using Watts, the FBI states that "Subject Adams' telephone and visitation are recorded and monitored, but he does not discuss sensitive matters by telephone. Adams reportedly has confided this information only to the CHS." *Id.* at 2. The request was endorsed by the United States Attorney's Office, Northern District of Georgia, AUSA Jeff Brown, who "considered the entrapment issue and foresees no problem." *Id.* at 3. In other words, AUSA Brown saw no problem with placing a wire on the informant and placing him in a cell with a defendant who was represented by counsel—the very "heart" of the *Massiah* decision.

To Defendant's knowledge, the authorization for wire was not given. Watts also requested transfer to federal custody.

16.

In a second interview on January 21, 2013, with FBI TFA William Stanphill, Watts advised that he had been moved from Defendant Adams' cell about three days prior.

17.

Watts gave additional information to the agent at the second interview regarding incriminating statements from Adams about the Militia of Georgia and Adams' current charges.

18.

Watts also stated that he sent two more letters to the interviewing FBI agent since the first meeting on January 15, 2013.

19.

**Watts' history with the FBI**, and his contact with special agents in the Gainesville division, **pre-dates** his contact by letter sometime between January 8, 2013, and January 15, 2013 relating to Defendant Adams.

20.

After Watts' conviction in 1996, he remained incarcerated in Wisconsin for several years. However, he claims to have applied for and been granted a transfer to Colorado in 2008 under the Interstate Corrections Compact, in order to be closer

7

to family in Las Vegas. *See* Exhibit B to first *Massiah* Motion (Doc. 152-2).

21.

During his transfer from Wisconsin to Colorado, Watts had a "layover" at a jail in Kentucky where he met a defendant named Stevan Senter. Senter was being extradited to Hall County on charges of rape and child molestation.

22.

Watts claimed that Senter confessed his crimes in detail to Watts while they were housed together for one-and-a-half to two hours in the Kentucky jail.

23.

Upon his arrival in Colorado, Watts made calls to the prison's "tips" hotline and reported that he had obtained information regarding two crimes while he was in route to Colorado via Kentucky: one involving a murder and robbery in Michigan, and the other related to child molestation in Georgia (Senter). *See* Exhibit C to first *Massiah* Motion (Doc. 152-3). Watts was interviewed by agents with the Inspector General's office in Colorado on April 21, 2008, regarding his information on the Georgia case.

24.

On February 4, 2010, the Hall County Superior Court issued a writ and order for production of Watts as an out-of-state witness for the State in the trial of Stevan

Senter for rape and aggravated child molestation. By reply letter dated March 12, 2010 to the Hall County District Attorney, Watts stated that he still wanted to do "the right and honest thing and testify against" Senter. *See* Exhibit D to first *Massiah* Motion (Doc. 152-4).

25.

Watts was brought to Georgia for the *Senter* trial in March of 2010. While he was in Hall County, Watts requested that Assistant District Attorney Vanessa E. Sykes set up a meeting for him with the FBI. **ADA Sykes arranged for the FBI to interview Watts at the Hall County Courthouse. The named FBI agent at that meeting with Watts is "Thompson."** *See* Exhibit E to first *Massiah* Motion (Doc. 152-5).

26.

Watts confirmed that this meeting with the FBI occurred in his letters to ADA Sykes dated April 12, 2010, and April 18, 2010.

27.

Immediately after providing his testimony in the *Senter* case, Watts sent a letter to the Hall County District Attorney regarding his "safety issues and concerns" while in Georgia and Colorado, and purported to have already written two letters to ADA Sykes requesting a telephone call. By October 5, 2010, Watts

informed the District Attorney by letter that Watts would have to "re-cant and go back" on his testimony in the *Senter* case, and threatened a civil lawsuit against the District Attorney and ADA Sykes.

28.

The *Senter* and *Adams* cases are not the only time that Watts has claimed to have received critical case information from his cellmates.

29.

On December 9, 2010, the FBI interviewed Investigator Larry Graham of the Colorado State Deparment of Corrections regarding a report made by Watts. Graham noted that Watts "portrays himself to prison officials as an intelligence source" who "claimed to know everything about everything." Graham further stated that "[w]ithin two weeks of his arrival, Watts provided bogus information about a planned inmate escape, and also claimed that an inmate death – which was determined to be an overdose – was in fact a homicide." Graham said Watts **"has a history of giving false reports and is an unreliable source of information."** *See* Exhibit L, FD302 in case no. 89B-SE-86493-OTHERS, dated December 9, 2010, Bates SOURCE-RPT-000283.

30.

The FBI, through SA G. D. Schoenlein, conducted another investigation into

a report by Watts on April 27, 2011. Watts wrote two letters to U.S. Attorney Jenny Durkin.[3] SA Schoenlein noted Watts' reputation as an "unreliable source of information." *See* Exhibit M, report in case no. 89B-SE-86493-OTHERS, dated April 27, 2011, Bates SOURCE-RPT-000284.

31.

FBI SA Schoenlein conducted yet another investigation into an allegation by Watts on August 3, 2011. Watts claims to have information regarding the 2001 homicide of AUSA Thomas C. Wales. SA Schoenlein concluded it was highly unlikely that Watts could have any firsthand knowledge of AUSA Wales' murder given that Watts began serving his 30-year prison term in 1996. *See* Exhibit N, report in case no. 89B-SE-86493-OTHERS, dated August 3, 2011, Bates SOURCE-RPT-000286.

## II. ARGUMENT

The Sixth Amendment provides that an accused shall have a right to assistance of counsel for his defense. U.S. Const. amend. VI. The revelation of an undercover government informant and the purported incriminating statements Defendant Adams made to him during the brief period they were housed together

---

[3] The contents of the letters are unknown, as the letters were omitted from the government's discovery. Defendant has requested said letters in his Second Amended Specific *Brady* Request (Doc. 197).

11

raises serious Sixth Amendment concerns. The testimony of this "Johnny-come-lately" jailhouse informant is at odds with Adams' right to counsel where it was elicited after Adams' indictment, while in police custody, and in the absence of counsel.

The case law is replete with instances of co-defendants and jailhouse informants cooperating with authorities to obtain information from an accused regarding past crimes. In the seminal case of *Massiah v. United States*, 377 U.S. 201, 84 S. Ct. 1199 (1964), a co-defendant cooperated with the government after indictment and allowed an agent to put a radio transmitter in his car and listen while he and the accused spoke, at which meeting the accused made incriminating statements which later were used against him at trial. The Supreme Court of the United States held that the defendant was denied his basic Sixth Amendment protections "where there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel." *Id.* at 206, 1203.

The Court addressed such Sixth Amendment violations again in *Henry v. United States*, 447 U.S. 264, 100 S. Ct. 2183 (1980), this time regarding incriminating statements made by the defendant to an undisclosed government informant while in custody post-indictment. Government agents contacted another

inmate, who had previously been a paid FBI informant, at the jail where Henry was held and told him to "be alert to any statements made" by the federal prisoners on his cellblock, including Henry. *Id.* at 266, 2184-85. The government agent contacted the informant upon his release from jail, and the informant relayed incriminating statements made to him by the defendant. The informant was paid for providing the information. *Id.* The informant testified at Henry's trial regarding the incriminating statements, and Henry appealed, claiming that the informant's testimony violated his Sixth Amendment right to counsel under *Massiah*. The Court held that the government violated Henry's Sixth Amendment right by intentionally creating a situation likely to induce the accused to make incriminating statements without assistance of counsel. *Id.* at 274, 2189.

Under this precedent, in order to establish a *Massiah/Henry* claim, an accused must meet a two-prong test: (1) his fellow inmate was a government agent, and (2) the inmate-informant must deliberately elicit incriminating statements from him. *See Depree v. Thomas*, 946 F.2d 784, 793 (11th Cir. 1991). The Eleventh Circuit Court of Appeals has referred to these as the "agency prong" and the "deliberate elicitation prong." *Id.*

### *A. Agency prong*

No bright-line rule exists for determining if an individual is a government agent in the Sixth Amendment realm, and courts must look to the facts and circumstances of each case. *Depree*, 946 F.2d at 793-94; *Lightbourne v. Dugger*, 829 F.2d 1012, 1019-20 (11th Cir. 1987). Watts became an undercover government informant at least as far back as 2008 when he first offered his testimony on the *Senter* case, and became an FBI informant after his meeting with the Gainesville agents in March of 2010. By the time he was placed in Defendant's cell, Watts was arguably an "informant at large" for the Government, from whom information of any criminal activity would be both expected and accepted. *See, e.g., United States v. Sampol*, 636 F.2d 621, 638 (D.C. Cir. 1980) (holding testimony of jailhouse informant was inadmissible where "it is clear that…[informant] was accepted by the government as an informant at large whose reports about any criminal activity would be gratefully received"). In addition to being an "informant at large", Watts was specifically an informant in this case. SA Harris' report stating that in late 2012 the FBI **"operated a CHS who reported on conversations that he had in the Hall County Jail with ADAMS"** is evidence of an agreement between Watts and the Government ***at the time the elicitation took place***. *See Depree*, 946 F.2d at 794.

Of course, "[d]irect proof of the State's knowledge will seldom be available to the accused," but evidence that the Government must have known its agent likely would obtain incriminating information from the defendant is enough to establish a Sixth Amendment violation. *Maine v. Moulton*, 474 U.S. 159, 176 n.12, 106 S. Ct. 477, 487 (1985) (holding defendant's Sixth Amendment right to counsel was violated when government surreptitiously recorded conversations between the accused and his co-defendant after indictment at a meeting to plan their defense strategy). Defendant Adams submits that it cannot be mere "luck or happenstance," *id.* at 176, that a <u>known</u> jailhouse informant arrived in Adams' cell from Colorado and procured a plethora of detailed, incriminating information from the accused in a few short days. This is especially true given the Government's report of operating a jailhouse source in late 2012. Even if Watts' arrival in Adams' cell is coincidence, the fact that the Government was "fortunate enough to have an undercover informant already in close proximity to the accused" does not change his status, nor his deliberate elicitation of statements from Adams regarding this case. *See Henry*, 447 U.S. at 272 n.10; *Maine*, 474 U.S. at 176-77 ("knowing exploitation by the State of an opportunity to confront the accused without counsel being present is as much a breach of the State's obligation…as is the intentional creation of such an opportunity").

### B. Deliberate elicitation prong

This Court has previously found that it is a subjective test as to whether an informant deliberately elicits incriminating statements from an accused. *United States v. Silva*, 2010 U.S. Dist. LEXIS 140186 at *37-40 (N.D. Ga. Nov. 2, 2010), Report and Recommendation of Mag. J. Baverman, adopted by and motion granted, 2011 U.S. Dist. LEXIS 5796 (N.D. Ga. Jan. 20, 2011). It is the subjective intent of the Government officers which controls whether they deliberately elicited a statement. *Id.* at *37 (finding that government agent's question was designed to deliberately elicit an incriminating response). Watts' history illustrates that he is a career informant and is known to the local federal agents. The circumstantial evidence—including Watts' placement in Adams' cell; the rapid time, manner, and means by which he was able to secure Adams' trust and obtain specific incriminating information from him regarding the current charges; his previous contacts with FBI agents in Gainesville; the Government's statement that it operated a jailhouse informant in late 2012—directly point to the government's intent to have Watts deliberately elicit incriminating statements from Defendant.

In determining whether the government's undercover agent deliberately elicited incriminating statements from the accused, the *Henry* Court noted three important factors: (1) the witness was acting under instructions as a paid informant

16

for the government; (2) the informant was "ostensibly no more than a fellow inmate" of the defendant; and (3) the defendant was in custody and under indictment at the time he was engaged in conversation by the informant. *Henry*, 447 U.S. at 270, 100 S. Ct. at 2186-87. The Court found the combination of circumstances sufficient to uphold the appellate court's determination of a *Massiah* violation. The witness had been a paid government informant for over a year, and the FBI agent was "aware that [informant] had access to Henry and would be able to engage him in conversations without arousing Henry's suspicions." *Id.* Watts likewise was ostensibly no more than a fellow inmate of Adams', whom Adams believed may be there for some amount of time on (fake) drug trafficking charges; and both Adams and Watts were in custody at the time of their conversations.

The *Henry* Court noted that "[e]ven if the [agent…] did not intend that the [informant] would take affirmative steps to secure incriminating information…he must have known that such propinquity likely would lead to that result." *Id.* at 271, 2187. In the same way, Watts' immediacy to Adams once he was placed in his cell (and purportedly had protected him from harm by his cellmates) would make it clear to the Government that Watts could elicit incriminating information from Adams. In addition, Watts has a propensity for this type of deliberate elicitation. The FBI's past meeting and correspondence with Watts, coupled with his history

17

of offering testimony after only brief exposure to an accused, would surely have put the Government on alert that Watts would try to secure incriminating information from Adams.

"Conversation stimulated" when the defendant is with a fellow inmate "acting by prearrangement as a Government agent" may elicit info that the accused would not otherwise reveal; indeed, the Court found Henry's incarceration a relevant factor, noting that "confinement may bring into play subtle influences that will make him particularly susceptible to the ploys of undercover Government agents." *Id.* at 273-74, 2188-89. This is not an instance of Watts merely "keeping his ears open." *See Lightbourne v. Dugger*, 829 F.2d 1012, 1019 (11th Cir. 1987). The Government operated Watts as an informant, and Watts ingratiated himself with Adams in a very brief time, as his history with Senter would illustrate he is wont to do. *See Sampol*, 636 F.2d 621, 638 (D.C. Cir. 1980) (informant-at-large's ability to ingratiate himself with cellmates was "part of his stock in trade"). By his own admission, he quickly obtained Adams' trust and confidence and allegedly elicited detailed statements from Adams, apparently within just a day or two of his arrival in Hall County.[4] It is worth noting, however, that Adams absolutely denies

---

[4] Defendant again notes the very tight timeline within which Watts was apparently working: he arrived in Hall County on Tuesday, January 8, 2013; was placed in Adams' cell on January 9, 2013; allegedly spoke to Adams in detail; wrote a letter

the truth of Watts' statements, and nothing said in this brief is intended to be read otherwise.

### III.  REMEDY

In light of the foregoing law, Watts' statements to the FBI agents and his testimony at trial should be excluded as in violation of Defendant Adams' Sixth Amendment right to counsel.

Defendant requests an evidentiary hearing on this Amended Motion.

Respectfully submitted, this 2nd day of January, 2013.

| | |
|---|---|
| **s/ Edward D. Tolley** | **s/ Barry V. Lombardo** |
| Georgia Bar No. 714300 | Georgia Bar No. 456460 |
| **s/ Devin Hartness Smith** | Attorney for Ray Adams |
| Georgia Bar No. 918980 | 5425 Honeysuckle Trail |
| Attorneys for Ray Adams | Gainesville, Georgia 30506 |
| Cook Noell Tolley & Bates LLP | (770) 888-3108 |
| 304 E. Washington Street | bvlombardo@comcast.net |
| P. O. Box 1927 | |
| Athens, Georgia 30603 | |
| (706) 549-6111 | |
| etolley@mindspring.com | |
| devinhsmith@yahoo.com | |

---

to the FBI; and had an interview with FBI agents, all by the following Tuesday, January 15, 2013.

## CERTIFICATE OF SERVICE

I hereby certify that on January 2, 2013, I electronically filed the Foregoing AMENDED *MASSIAH* MOTION TO EXCLUDE with the Clerk of Court using the CM/ECF system which will automatically send email notification of such filing to the following attorneys of record:

Jeffrey Aaron Brown
U.S. Attorney's Office-ATL
600 U.S. Courthouse
75 Spring Street, S.W.
Atlanta, GA 30303
404-581-6064
Jeff.A.Brown@usdoj.gov

Daniel A. Summer
Summer & Summer
Imperial Building
P.O. Box 921
101 Bradford Street, NW
Gainesville, GA 30503-0921
770-535-1700
danosummer@aol.com

s/ Edward D. Tolley
Georgia Bar No. 714300
Attorney for Ray Adams
Cook Noell Tolley & Bates LLP
304 E. Washington St.
P. O. Box 1927
Athens, Georgia 30603
(706) 549-6111
etolley@mindspring.com
